1

2

3

4

5

6

7

8                           UNITED STATES DISTRICT COURT

9                           EASTERN DISTRICT OF CALIFORNIA

10

11    J.A., a minor by her Guardian ad Litem          No.  1:21-cv-00252-KES-EPG
      Luz Ana Venegas, individually and as
12    successor-in-interest to Decedent Artemio
      Alfaro,
13                                                     ORDER GRANTING IN PART, AND
                      Plaintiff,                       DENYING IN PART, DEFENDANTS'
14                                                     MOTION FOR SUMMARY JUDGMENT
              v.
15
      MADERA COUNTY, et al.,
16                                                     (Doc. 52)
                      Defendants.
17

18

19

20

21           This case arises from the April 29, 2020, fatal officer-involved shooting of plaintiff J.A.'s

22    father, Artemio Alfaro.  J.A., through her guardian ad litem Luz Ana Venegas, brings federal and

23    state law claims individually and as successor in interest to her father.  Doc. 12.  Defendants

24    County of Madera, Brendan Johnson, Logan Majeski, and Jose Iniguez move for summary

25    judgment.  Doc. 52.  The Court took the motion under submission.  Doc. 72.  For the reasons set

26    forth below, the motion for summary judgment is granted in part and denied in part.

27    ///

28    ///

                                                      1

1    **I.    BACKGROUND**

2        **A.    <u>Factual Background[1]</u>**

3        On April 29, 2020, the Madera County Sheriff's dispatch was notified that Alfaro was

4    near the La Vina Market and was wanted for outstanding warrants.  DSUF No. 1.  Alfaro had

5    three outstanding arrest warrants: a felony warrant for violation of Penal Code section 211

6    (robbery), and two misdemeanor warrants for violations of Penal Code Sections 243

7    (misdemeanor domestic battery) and 273.6 (violation of domestic violence restraining order).

8    DSUF No. 2.  The Sheriff's Office had the legal authority to arrest Alfaro and there was a

9    probable cause declaration for the Penal Code section 211 (robbery) violation posted at the

10   Sheriff's Office headquarters.  DSUF No. 3.  The robbery charge involved Alfaro taking a

11   cellphone and charger from his former domestic partner, who had a restraining order against him.

12   Decl. of Barry Brodd, Doc. 63-3 ¶ 14; Doc. 65 at 3.  Shortly after taking the cellphone and

13   charger, Alfaro dropped the items and left the area.  Decl. of Barry Brodd, Doc. 63-3 ¶ 14.  The

14   parties dispute whether all the defendants were aware of the specific facts underlying the robbery

15   charge.  PSUF No. 2.

16       Alfaro was known to flee from law enforcement.  DSUF No. 5.  However, Alfaro had

17   never been charged with violence against a peace officer.  PSUF No. 3.  Madera County Sheriff's

18   deputies developed a plan whereby two units (Deputy Brendan Johnson and Corporal Andrew

19   Rodriguez) would go to Road 24 (north of Alfaro's location), and the units of Sergeant Jeff

20   Thomas, Deputy Logan Majeski, and Deputy Jose Iniguez would go to Avenue 9 (southwest of

21   Alfaro's location).  DSUF No. 6.  The plan was for the officers to force Alfaro away from the

22   populated area of La Vina and to approach Alfaro from two directions.  DSUF No. 7.  If Alfaro

23   ran, the units to the south would be able to apprehend him.  *Id.*  However, when the units on

24   Avenue 9 parked and the deputies exited the vehicle, Alfaro was tipped off to their presence, ran

---

25   [1] The facts that follow are undisputed unless otherwise noted and are derived from the undisputed
26   facts submitted by defendants, responded to by plaintiff, and replied to by defendants (Doc. 66)
     ("DSUF"); the additional undisputed facts submitted by plaintiff and responded to by defendants
27   (Doc. 66 ("PSUF")); as well as declarations and exhibits attached to the motion and opposition,
     including body camera and dashboard camera footage.

28

across the street, and entered his truck, a dark colored Ford F150.  DSUF Nos. 11, 12.

## 1. Vehicle Pursuit

Alfaro drove north on Road 24, where he encountered defendant Johnson driving south with his emergency lights and siren activated.  DSUF No. 13.  Alfaro turned east into an agricultural field, followed by Johnson.  DSUF No. 14.  During this pursuit, the patrol unit driven by defendant Majeski (with his police dog) pulled in front of Johnson's patrol car.  DSUF No. 16. Majeski led the pursuit of Alfaro, followed by Johnson, Rodriguez, and Thomas, on Avenue 9 through and beyond the La Vina area.  DSUF No. 17.  Sergeant Thomas was the supervisor in charge of the pursuit, pursuant to Section 306.4 of the Sheriff's vehicle pursuit policy (Policy No. 306).  DSUF No. 18.  Thomas did not observe pedestrian traffic and there was minimal vehicular traffic, and he decided to continue the pursuit because he did not believe it presented a great risk of harm.  DSUF Nos. 25-26.

Alfaro drove his truck west on Avenue 9 at approximately 100 mph and ran multiple stop signs.  DSUF No. 19.  In fleeing from the deputies in his vehicle, Alfaro violated Vehicle Code section 2800.2.[2]  DSUF No. 21.  Alfaro then drove at a high rate of speed to Avenue 6.  DSUF No. 24.  After passing a row of housing, Alfaro took a turn onto a dirt road of an agricultural property located on Avenue 6, followed by the pursuing deputies.  DSUF No. 27.  Johnson slowed down to follow Majeski and noticed in the distance a portable restroom for field laborers. DSUF No. 29.  As Johnson drove on the dirt pathway, a farm tractor passed in front of him. DSUF No. 31.

///

///

---

[2] Vehicle Code section 2800.2 provides, in part, that "[i]f a person flees or attempts to elude a pursuing peace officer in violation of Section 2800.1 and the pursued vehicle is driven in a willful or wanton disregard for the safety of persons or property, the person driving the vehicle, upon conviction, shall be punished by imprisonment in the state prison, or by confinement in the county jail for not less than six months nor more than one year."  Cal. Veh. Code § 2800.2(a).  A "willful or wanton disregard for the safety of persons or property includes, but is not limited to, driving while fleeing or attempting to elude a pursuing peace officer during which time either three or more violations that are assigned a traffic violation point count under Section 12810 occur, or damage to property occurs."  Cal. Veh. Code § 2800.2(b).

1                    **2.    Alfaro Exits the Truck**

2          When Alfaro reached the equipment yard of the agricultural property, Alfaro exited his

3    vehicle in an attempt to escape from the pursuing deputies.  DSUF No. 34.  Because Alfaro was

4    reported to have exited the vehicle, Johnson stopped his vehicle to establish a perimeter and to

5    prevent the tractor from entering the equipment yard.  DSUF No. 35.

6          As he arrived at the property, Majeski noticed Alfaro running out of an oleander bush.

7    DSUF No. 36.  Majeski was wearing a body-worn camera that was activated.  Majeski

8    commanded Alfaro to get on the ground or he was going to get bitten by his police dog.  DSUF

9    No. 37.  Alfaro fled from Majeski and the dog and reentered his truck.  DSUF No. 38.  When he

10   arrived at Alfaro's truck, Majeski struck Alfaro in the face through the open window.[3]  Majeski

11   opened the driver's door and commanded the dog to bite Alfaro, but Alfaro actively resisted by

12   kicking back at the dog.  DSUF No. 41.

13         Johnson's police vehicle had a dashboard camera that was activated.  DSUF No. 74.

14   Johnson drove forward into the equipment yard and saw a light colored truck to his right with an

15   open door.  DSUF No. 43.  Johnson saw Majeski's patrol vehicle at the north end of the

16   equipment yard, as well as two other cars parked in front of the residence just west of Majeski's

17   vehicle.  DSUF No. 44.  Johnson drove up to Alfaro's truck and placed his vehicle's push bar

18   against the left front bumper of Alfaro's truck.  DSUF No. 46.

19         As Johnson arrived, defendants Majeski and Iniguez were struggling with Alfaro, who

20   was in the driver's seat of his parked truck.  Iniguez attempted to grab Alfaro from the front

21   passenger window of the truck and prevent him from putting the vehicle in gear.  DSUF No. 47.

22   After attempting to grab Alfaro's arm to pull him out of the truck, Majeski put his taser in drive

23   stun mode and used it on Alfaro.  *See* DSUF No. 48.  Alfaro started his vehicle and moved

24   forward, pushing against Johnson's occupied patrol vehicle.  *See* DSUF No. 49.  The video

25   footage shows that Alfaro then shifted his truck into reverse and backed it up away from the

26   officers while turning the truck so that it was facing more than 90º away from the direction it had

27   _____

28   [3] The parties dispute whether Alfaro attempted to strike Majeski with his hand.  DSUF No. 40.

1    been facing.  *See also* DSUF No. 50.  The parties dispute whether Majeski was struck by the open

2    driver's door of the truck as Alfaro was backing it up, but the parties agree that the vehicle's

3    movement caused the driver's side door to push Majeski away from the vehicle.  DSUF No. 51.

4    Majeski did not fall, and he caught and braced himself against a container.  Majeski Dep. 66:13-

5    20, Aug. 15, 2024.  As a result of Alfaro backing up the truck while turning it away from the

6    officers, the officers were now facing the passenger side of the truck.  Johnson pulled out his

7    service weapon, pointed it at the passenger side of the truck, and headed toward the truck yelling

8    "Stop."  *See* DSUF No. 51.

9         Majeski moved behind and to the right of Johnson.  DSUF No. 54.  Johnson continued to

10   point his service weapon at the passenger side of the truck, and through the passenger side to

11   Alfaro in the driver's seat, and he again yelled "Stop."  DSUF No. 58.  The video shows that

12   Alfaro had backed the truck up while turning it such that its passenger side was now facing the

13   officers, with the front of the truck angled away from officers.  *See also* DSUF Nos. 57, 59.

14   Alfaro stopped reversing and turned the front wheel in the direction away from the officers.  *Id.*

15   Alfaro then appeared to place the transmission into drive.  *See* DSUF No. 60.

16        As the truck started moving forward at an angle away from the officers, Johnson fired an

17   initial volley of seven shots into the passenger side of the vehicle, aiming at Alfaro in the driver's

18   seat.  *See* DSUF No. 66.  Iniguez was standing beside Johnson but did not use his weapon.

19   Alfaro's truck then moved forward quickly and the front bumper collided with a fuel trailer.

20   DSUF No. 67-68.  The truck became stuck but its tires continued to spin forward.  DSUF

21   Nos. 68, 70.  From the passenger side of the truck, Johnson fired three additional shots into the

22   truck at Alfaro.[4]  DSUF Nos. 68-69.  Alfaro was removed from the truck and officers determined

23   he had been hit with several shots and had died.  *See* DSUF No. 72.

24   ///

25   ///

26

27   ─────────────────────
     [4] Johnson states that he noticed Alfaro make a movement suggestive of shifting the transmission.
     DSUF No. 68.  Plaintiff disputes this and argues that Alfaro was deceased or unresponsive at this
28   time.  DSUF No. 68.

5

1    **B.    Procedural Background**

2    Plaintiff asserts constitutional claims under 42 U.S.C. § 1983 and state law claims, against

3    defendants Johnson, Majeski, Iniguez, and the County of Madera.  First Amended Complaint

4    ("FAC"), Doc. 12.  On June 6, 2023, the Court adopted findings and recommendations and

5    granted in part and denied in part defendants' motion to dismiss.  Doc. 32.  In the June 6, 2023

6    order, the Court indicated that this case would proceed on plaintiff's: (1) first cause of action to

7    the extent plaintiff asserted Fourth and Fourteenth Amendment claims for excessive force,

8    unlawful seizure, and deprivation of due process rights against Johnson, and unlawful seizure

9    claims against defendants Iniguez and Majeski; (2) the state law battery claim against Johnson

10   and Madera County; (3) the state law negligence claim for wrongful death against all defendants;

11   and (4) the Bane Act claim against Johnson.  Doc. 32 at 4.

12   Defendants move for summary judgment on plaintiff's federal and state law claims on the

13   basis that (1) Johnson's use of force was objectively reasonable; (2) Johnson is entitled to

14   qualified immunity; (3) defendants are entitled to summary judgment on the battery and negligent

15   wrongful death claims; and (4) there is no evidence of egregious conduct on the part of any

16   deputy to support a cause of action under the Bane Act.  Doc. 52 at 2-3.  Plaintiff filed an

17   opposition on February 24, 2025, and defendants filed their reply, along with evidentiary

18   objections, on March 6, 2025.  Docs. 63, 65, 67.

19   **II.    LEGAL STANDARD**

20   Summary judgment is appropriate if "there is no genuine dispute as to any material fact

21   and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A dispute is

22   "genuine" if "a reasonable jury could return a verdict for the nonmoving party."  *Anderson v.*

23   *Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A fact is "material" if it "might affect the outcome

24   of the suit under the governing law."  *Id.*  The parties must cite "particular parts of materials in

25   the record."  Fed. R. Civ. P. 56(c)(1).  The court then views the record in the light most favorable

26   to the nonmoving party and draws reasonable inferences in that party's favor.  *Matsushita Elec.*

27   *Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587–88 (1986).  The nonmoving party's version

28   of the facts need not be credited if it is blatantly contradicted by video evidence.  *Vos v. City of*

1  *Newport Beach*, 892 F.3d 1024, 1028 (9th Cir. 2018).  The "purpose of summary judgment is to

2  'pierce the pleadings and to assess the proof in order to see whether there is a genuine need for

3  trial.'" *Matsushita*, 475 U.S. at 587 (citations omitted).

4          "A party seeking summary judgment bears the initial burden of informing the court of the

5  basis for its motion and of identifying those portions of the pleadings and discovery responses

6  that demonstrate the absence of a genuine issue of material fact."  *Soremekun v. Thrifty Payless,*

7  *Inc.*, 509 F.3d 978, 984 (9th Cir. 2007) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323

8  (1986)).  If—as is the case here with respect to defendants' affirmative defense of qualified

9  immunity—"the moving party will have the burden of proof on an issue at trial, the movant must

10  affirmatively demonstrate that no reasonable trier of fact could find other than for the moving

11  party."  *Soremekun*, 509 F.3d at 984; *Moreno v. Baca*, 431 F.3d 633, 638 (9th Cir. 2005) ("[T]he

12  moving defendant bears the burden of proof on the issue of qualified immunity.").

13          If the moving party meets its initial burden, the burden shifts to the nonmoving party to

14  produce evidence supporting its claims or defenses and "establish that there is a genuine issue of

15  material fact."  *Matsushita*, 475 U.S. at 585.  The nonmoving party "must do more than simply

16  show that there is some metaphysical doubt as to the material facts."  *Id.* at 586 (citation omitted).

17  "The mere existence of a scintilla of evidence in support of the [nonmovant's] position" is

18  insufficient to survive summary judgment.  *Anderson*, 477 U.S. at 252.

19          In the endeavor to establish the existence of a factual dispute, the nonmoving party need

20  not establish a material issue of fact conclusively in its favor.  *T.W. Elec. Serv., Inc. v. Pac. Elec.*

21  *Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).  It is sufficient that "the claimed factual

22  dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at

23  trial."  *Anderson*, 477 U.S. at 252 (quoting *First Nat. Bank of Ariz. v. Cities Serv. Co.*, 391 U.S.

24  253, 289 (1968)).  In addition, "[t]he mere existence of video footage of the incident does not

25  foreclose a genuine factual dispute as to the reasonable inferences that can be drawn from that

26  footage."  *Vos*, 892 F.3d at 1028 (citing *Scott v. Harris*, 550 U.S. 372, 380 (2007)).

27          "If the nonmoving party fails to produce enough evidence to create a genuine issue of

28  material fact, the moving party wins the motion for summary judgment.  But if the nonmoving

1  party produces enough evidence to create a genuine issue of material fact, the nonmoving party

2  defeats the motion." *Nissan Fire & Marine Ins. Co. v. Fritz Companies, Inc.*, 210 F.3d 1099,

3  1103 (9th Cir. 2000) (citing *Celotex*, 477 U.S. at 322).

4  **III.    EVIDENTIARY OBJECTIONS**

5        "[A]t the summary judgment stage, we do not focus on the admissibility of the evidence's

6  form.  We instead focus on the admissibility of its contents." *Sandoval v. Cnty. of San Diego*, 985

7  F.3d 657, 666 (9th Cir. 2021).  That is, though such evidentiary objections could prove

8  cognizable at trial, only the admissibility of the relevant facts at trial, not the form of these facts

9  as presented in the motion, matters for purposes of a motion for summary judgment.  *See id.*

10  Where "the contents of a document can be presented in a form that would be admissible at trial—

11  for example, through live testimony by the author of the document—the mere fact that the

12  document itself might be excludable hearsay provides no basis for refusing to consider it on

13  summary judgment." *Id.* (citations omitted).

14        To the extent that the Court relies upon evidence to which a party objects in deciding the

15  motion for summary judgment, the objections are overruled.  To the extent the Court does not, the

16  objections are denied as moot.

17  **IV.    ANALYSIS**

18        **A.    <u>Federal Law Claims</u>**

19        Under 42 U.S.C. § 1983, a private right of action exists against anyone who, "under color

20  of" state law, causes a person to be subjected "to the deprivation of any rights, privileges, or

21  immunities secured by the Constitution and laws."  42 U.S.C. § 1983.  Qualified immunity

22  protects government officials from liability under § 1983 "unless (1) they violated a federal

23  statutory or constitutional right, and (2) the unlawfulness of their conduct was 'clearly established

24  at the time.'" *D.C. v. Wesby*, 583 U.S. 48, 62–63 (2018) (quoting *Reichle v. Howards*, 566 U.S.

25  658, 664 (2012)).

26        **1.    Fourth Amendment Excessive Force**

27        Defendants move to dismiss the Fourth Amendment claim against Johnson on the basis

28  that Johnson's use of force was reasonable and not a constitutional violation and on the basis that

1    he is entitled to qualified immunity.  Because whether the officer's conduct violated a

2    constitutional right is a component of the qualified immunity analysis, the Court proceeds directly

3    to consideration of qualified immunity.

4        "Qualified immunity balances two important interests—the need to hold public officials

5    accountable when they exercise power irresponsibly and the need to shield officials from

6    harassment, distraction, and liability when they perform their duties reasonably." *Pearson v.*

7    *Callahan*, 555 U.S. 223, 231 (2009).  An officer may be denied qualified immunity only if

8    "(1) the [evidence], taken in the light most favorable to the party asserting injury, show[s] that the

9    officer's conduct violated a constitutional right, and (2) the right at issue was clearly established

10   at the time of the incident such that a reasonable officer would have understood her conduct to be

11   unlawful in that situation." *Calonge v. City of San Jose*, 104 F.4th 39, 44 (9th Cir. 2024) (quoting

12   *Torres v. City of Madera*, 648 F.3d 1119, 1123 (9th Cir. 2011)).  "While there does not have to be

13   a case directly on point, existing precedent must place the lawfulness of the [conduct] beyond

14   debate." *Villanueva v. California*, 986 F.3d 1158, 1165 (9th Cir. 2021) (internal quotation marks

15   and citations omitted).

16                          *a.  Constitutional Violation*

17       Claims of excessive force during an arrest are examined under the Fourth Amendment's

18   prohibition against unreasonable seizures.  *Villanueva*, 986 F.3d at 1169.  The inquiry is whether

19   an officer's actions were reasonable under the totality of the circumstances.  *Id.*  The Court should

20   carefully balance "the nature and quality of the intrusion on the individual's Fourth Amendment

21   interests' against the countervailing government interests at stake." *Hart v. City of Redwood City*,

22   99 F.4th 543, 549 (9th Cir. 2024) (internal quotation marks and citation omitted).

23       "The calculus of reasonableness must embody allowance for the fact that police officers

24   are often forced to make split-second judgments—in circumstances that are tense, uncertain, and

25   rapidly evolving—about the amount of force that is necessary in a particular situation." *Graham*

26   *v. Connor*, 490 U.S. 386, 396-97 (1989).  In this context, reasonableness is to be "judged from the

27   perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight."

28   *Id.* at 396 (citing *Terry v. Ohio*, 392 U.S. 1, 20–22 (1968)).  Because this is an objective inquiry,

1    an officer's intentions – good or ill – have no bearing on whether he employed excessive force.

2    *Id.* at 397. In addition, "[o]nly information known to the officer at the time the conduct occurred

3    is relevant." *S.R. Nehad v. Browder*, 929 F.3d 1125, 1132 (9th Cir. 2019). "The reasonableness

4    standard nearly always requires a jury to sift through disputed factual contentions, so summary

5    judgment in an excessive-force case should be granted sparingly.'" *Est. of Aguirre v. Cnty. of*

6    *Riverside*, 29 F.4th 624, 628 (9th Cir. 2022) (internal quotation marks and citation omitted).

7    "Deadly force is the most severe intrusion on Fourth Amendment interests because an

8    individual has a 'fundamental interest in his own life' and because, once deceased, an individual

9    can no longer stand trial to have his 'guilt and punishment' determined." *Id.* (internal citation

10   omitted). Because Johnson used deadly force against Alfaro, the Court examines whether the

11   governmental interests at stake justified the use of deadly force. *Vos*, 892 F.3d at 1031.

12   The government's interests include "the severity of the crime at issue, whether the suspect

13   poses an immediate threat to the safety of the officers or others, and whether he is actively

14   resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396. "The

15   immediacy of the threat posed by the suspect is the most important factor." *Gonzalez v. City of*

16   *Anaheim*, 747 F.3d 789, 793 (9th Cir. 2014) (citing *Mattos v. Agarano*, 661 F.3d 433, 441 (9th

17   Cir. 2011) (en banc). "These factors are not exclusive, and we consider the totality of the

18   circumstances." *Id.* at 793-94 (citing *Bryan v. MacPherson*, 630 F.3d 805, 826 (9th Cir. 2010)).

19   The parties do not dispute that Johnson shot Alfaro while Alfaro was attempting to flee.

20   "In cases involving use of deadly force against a fleeing suspect, the Supreme Court has crafted a

21   more definitive rule, allowing an officer to use deadly force only if the officer has probable cause

22   to believe that the suspect poses a threat of serious physical harm, either to the officer or to

23   others." *Villanueva*, 986 F.3d at 1169 (internal citations and quotation marks omitted). A suspect

24   may pose a threat of serious physical harm if "there is probable cause to believe that he has

25   committed a crime involving the infliction or threatened infliction of serious physical harm, or if

26   the suspect threatens the officer or others with a weapon capable of inflicting such harm." *Orn v.*

27   *City of Tacoma*, 949 F.3d 1167, 1174 (9th Cir. 2020) (internal citation and quotation marks

28   omitted).

1    Defendants argue that Johnson's use of deadly force was objectively reasonable under the

2    circumstances, as a matter of law, because Alfaro had evaded the police through a high-speed

3    vehicle chase, Alfaro resisted Majeski and Iniguez's attempts to arrest him in the equipment yard,

4    and Johnson believed that the lives of Majeski or others were in immediate danger when Alfaro

5    attempted to evade arrest by driving away in his truck. *See* Doc. 52. The parties dispute whether

6    the officers knew or should have known about the specific circumstances of Alfaro's underlying

7    robbery charge. The parties also dispute whether Alfaro struck Majeski and whether Majeski was

8    touched by the truck's door as Alfaro backed the truck away from the officers. The principal

9    dispute, though, is whether Majeski or other persons were in danger of being struck by Alfaro's

10   truck when Alfaro was attempting to drive away.

11   The reasonableness of Johnson's actions cannot be determined as a matter of law because

12   the "key facts demarcating the line between reasonable and unreasonable force are in dispute."

13   *Villanueva*, 986 F.3d at 1169. Alfaro's truck could "pose a threat of serious physical harm, but

14   only if someone is at risk of being struck by it." *Id.* At the time that Johnson used excessive

15   force, the high-speed chase had ended. *See Villanueva*, 986 F.3d at 1170 (action did not involve

16   high-speed chase because plaintiff had slowed below the speed limit and made a stop). After

17   Alfaro reentered his truck to flee, he backed the truck away from the officers at an angle and,

18   arguably, was attempting to drive off in the other direction when Johnson shot into the truck's

19   passenger side. The "key question" is whether Alfaro "accelerated or attempted to accelerate

20   toward" the officers or other person before Johnson shot Alfaro. *Villanueva*, 986 F.3d at 1170.

21   Taking the facts in the light most favorable to the plaintiff, a reasonable jury could find he did not

22   do so.

23   While defendants assert that Majeski or another officer were in danger of being struck by

24   Alfaro's truck, a reasonable jury reviewing the video footage could determine that Alfaro had

25   backed the truck up at over a 90° angle away from the officers, and had then turned the front tires

26   away from the officers before putting the truck from reverse into drive, as if he were intending to

27   flee from the officers in the opposite direction. A reasonable jury could conclude that the risk at

28   that point was that Alfaro would manage to flee in the truck away from the officers, not that the

officers were in danger of being hit.  The jury could find that, in such circumstances, it was not objectively reasonable for Johnson to shoot Alfaro to prevent his escape and the resumption of the vehicle chase.  Taking the facts in the light most favorable to plaintiff and giving "due deference to [Johnson's] assessment of the danger presented[,]" a reasonable jury could find that the use of force was excessive.  *See Orn*, 949 F.3d at 1174.

As the authority cited by defendants shows, a person must be in danger of being struck by the vehicle for the use of deadly force to be reasonable.  In *Monzon*, a driver led police officers on a high-speed chase at night before stopping in a dead-end street with no lights.  *Monzon v. City of Murrieta*, 978 F.3d 1150, 1153 (9th Cir. 2020).  The driver then turned his van around, pointing it generally towards the officers, and accelerated generally toward them.  *Id.* 1153-1154.  The officer shot the driver several times as the van approached the officers and crashed an officer's cruiser at 17.4 miles per hour.  *Id.* 1155.  There was evidence that the accelerator pedal had been pushed from 84 to 99 percent.  *Id.*  On those facts, the *Monzon* court affirmed summary judgment for the officers, reasoning that the officers' use of deadly force was justified because they could hear the engine revving, the driver had hit a fencepost and a police cruiser, and the officers were situated on all sides of a van containing a driver desperate to escape.  *Id.* at 1158.  As there was no dispute that the driver was driving toward one or more of the five officers when the shots were fired, the *Monzon* court held that the force was reasonable as a matter of law.  *Id.* at 1159.

Likewise, the Ninth Circuit found in *Wilkinson* that the use of force was reasonable because the officer had probable cause to believe that the driver posed an immediate threat to the safety of himself and another officer where the shooting officer was standing in a slippery yard with a minivan accelerating around him.  *Wilkinson v. Torres*, 610 F.3d 546, 551–53 (9th Cir. 2010).  In *Wilkinson*, a car chase led the officers to use a Pursuit Immobilization Technique ("PIT") twice on the minivan.  *Id.* at 549.  After the minivan hit a telephone pole, the officers approached the minivan on foot, and an officer fell on the ground near the front of the vehicle around the same time that the minivan started moving in reverse.  *Id.* at 549.  The minivan threw mud from its wheels but was accelerating, with an officer nearby who had fallen and was either lying on the ground or standing but disoriented.  *Id.*  The officer had fallen near the driver-side

1   front of the vehicle and the minivan was moving in reverse, with the front of the minivan

2   swinging toward the driver side.  *Id.* at 549.  Although the vehicle was moving at a slow rate of

3   speed because of the slippage, the minivan could have gained traction at any time with two

4   officers nearby, one of whom was in the path of the minivan, in a partially enclosed yard.  *Id.* at

5   552.  On those facts, the use of force was reasonable because the undisputed facts established that

6   the shooting officer had a reasonable basis to fear for both his and his fellow officer's safety.

7      Here, Johnson states that he saw "out of the corner of [his] eye" that Alfaro's vehicle door

8   made contact with Majeski as Alfaro was backing up away from the officers, and that Majeski fell

9   backwards onto a container.  DSUF No. 53.  Johnson further argues that he believed that if Alfaro

10   was allowed to flee, Alfaro would pose an immediate threat to the life of either Majeski (if Alfaro

11   turned toward the officers) or to agricultural workers and incoming Sheriffs units (if Alfaro

12   turned away from the officers and drove off).[5]  DUSF No. 63; Decl. of Brendan Johnson, Doc. 56

13   ¶ 13.  Johnson argues that his use of deadly force was justified because he did not know where

14   Majeski was located or if Majeski was on the ground.

15      However, at summary judgment, the Court must view the facts in the light most favorable

16   to plaintiff.  Majeski's body camera video shows that no officer was in the path of Alfaro's truck.

17   Video evidence "alone [can] raise[ ] material questions of fact about the reasonableness of

18   [Johnson's] actions and the credibility of his post-hoc justification of his conduct."  *Longoria v.*

19   *Pinal Cnty.*, 873 F.3d 699, 706 (9th Cir. 2017).  "[T]he probative value of real-time videos and

20   frozen frames is more appropriately a matter for a jury to view and evaluate, not a matter for a

21   court to resolve on summary judgment."  *Id.* at 706, n.5.  The video shows that at the time Johnson

22   shot the initial volley of shots, no officer was in Alfaro's path, and it appears that Alfaro turned,

23   or was in the process of turning, his front wheels away from the officers to flee in the opposite

24   direction.  The video also shows that Iniguez initially pointed his weapon at the vehicle but

25   lowered it as Alfaro's truck started to move away from the officers.  In contrast, that is when

26

27   _____

[5] Johnson did not believe that Iniguez or he were in danger.  *See* Decl. of Brendan Johnson, Doc.
56 ¶¶ 11-15 (describing Alfaro's options as either driving right and endangering Majeski or

28   turning left and endangering agricultural workers or approaching Sheriff's units).

Johnson fired seven times into the passenger side of the truck. Nor does Iniguez appear to be pointing his weapon at the truck when Johnson fired the three additional shots.

"Officers can have reasonable, but mistaken, beliefs as to the facts establishing the existence of an immediate threat, and in those situations courts will not hold that they have violated the Constitution." *Est. of Strickland v. Nevada County*, 69 F.4th 614, 621 (9th Cir. 2023) (quotation marks and citations omitted) (holding that officers' perception that a plastic, airsoft replica gun was a real firearm was not unreasonable). "When an officer's use of force is based on a mistake of fact, we ask whether a reasonable officer would have or *should* have accurately perceived that fact." *Id.* (quotation marks omitted) (citing *Torres v. City of Madera*, 648 F.3d 1119, 1124 (9th Cir. 2011)). "Whether the mistake was an *honest* one is not the concern, only whether it was a *reasonable* one." *Nehad*, 929 F.3d at 1133 (quotation marks omitted) (emphasis in original).

Viewing the evidence in the light most favorable to plaintiff, a reasonable officer under the circumstances would conclude that Alfaro was attempting to flee by turning and driving away from the officers and that neither Majeski nor any other officer was in immediate danger of being struck by the fleeing truck. The body camera video shows that Alfaro backed the truck up until it was angled away from the officers, and that he then turned the front tires in the direction away from the officers before putting the truck from reverse into drive. Also, Majeski did not fall. Majeski Dep. 66:13-20, Aug. 15, 2024. Majeski braced himself against the container and then proceeded to get behind Johnson. A reasonable jury could find that Alfaro had backed the truck away from the officers at an angle until the officers were facing the passenger side of the truck, and that Alfaro then turned the front tires away from the officers and put the truck in drive, as if to drive off in the opposite direction, when Johnson shot into the passenger side of the truck at Alfaro, who was in the driver's seat. Moreover, driving toward Majeski and the other officers would have impeded Alfaro's flight as that direction was obstructed by two Sheriff's vehicles and the container. It is for the jury to determine if there was nonetheless an immediate risk that Alfaro was turning, or would turn, toward the officers and endanger the life of Majeski.

Plaintiff also disputes that there is any evidence that the lives of agricultural workers or

1 incoming Sheriff's units were threatened. Although defendants argue that the presence of the

2 portable bathroom and vehicles suggest that agricultural workers or others were nearby,

3 defendants do not cite to any evidence that Johnson saw any agricultural workers nearby, much

4 less any evidence that any workers were in immediate danger of harm from the fleeing truck.

5 Viewed in the light most favorable to plaintiff, Alfaro did not pose an immediate threat to the

6 lives of agricultural workers or incoming Sheriff's units.

7    The jury will need to consider the totality of the circumstances in evaluating the

8 reasonableness of Johnson's use of force. Construing the facts in the light most favorable to the

9 plaintiff, defendants do not establish as a matter of law that either law enforcement officers or

10 agricultural workers were at the risk of being struck by Alfaro's truck at the time Johnson fired

11 the shots. Under plaintiff's version of events, which a reasonable jury could credit based on the

12 video footage, Alfaro was attempting to evade arrest by driving away from the officers. A

13 reasonable jury may, when viewing the evidence, find that Johnson acted reasonably, but the

14 Court cannot find that as a matter of law. *Orn*, 949 F.3d at 1180 (when construing the facts in the

15 light most reasonable to plaintiff, at the time force was used, plaintiff did not engage in conduct

16 posing a threat of serious physical harm to the officer or others in vicinity). The reasonableness

17 of Johnson's conduct is a question for the jury.

18                      ***b. Clearly Established Law***

19    Whether Johnson reasonably perceived a threat to the officers or others depends on

20 disputed questions of fact that "preclude[s] a grant of summary judgment on qualified immunity."

21 *Nehad*, 929 F.3d at 1140. Viewing the facts in the light most favorable to the plaintiff, no officer

22 or person was in immediate danger of being struck by Alfaro's truck when Johnson fired the

23 shots. Even after Alfaro was shot seven times, his vehicle did not move towards any officer or

24 other person. Moreover, after the initial seven shots, Johnson fired three additional shots

25 although Alfaro's truck was stuck.

26    As the Court in *Orn* recognized, qualified immunity does not shield an officer when,

27 taking the facts in the light most favorable to plaintiff, a "reasonable jury could conclude both that

28 [the officer] was never in the path of [the] vehicle and that he fired through the passenger-side

1  windows and rear windshield as the vehicle was moving away from him.  On that score, 'existing

2  precedent squarely governs the specific facts at issue.'"  *Orn v. City of Tacoma*, 949 F.3d 1167,

3  1178 (9th Cir. 2020) (internal citation omitted).  "The right not to be shot in a car that poses no

4  immediate danger to police officers or others is clearly established."  *Losee v. City of Chico*, 738

5  F. App'x 398, 400 (9th Cir. 2018) (when viewed in the light most favorable to plaintiff, no

6  immediate threat of physical harm as officer fired through the back window as the vehicle began

7  to pull forward in a direction away from the officers); *see also Acosta v. City & Cty. of S.F.*, 83

8  F.3d 1143, 1146-48 (9th Cir. 1996) (qualified immunity denied because "the law governing

9  'shooting to kill' a fleeing suspect is clearly established and because a reasonable officer could

10  not have reasonably believed that shooting at the driver of the slowly moving car was lawful"

11  when he could avoid being injured by simply stepping to the side); *see also Adams v. Speers*, 473

12  F.3d 989, 991–92, 994 (9th Cir. 2007) (qualified immunity denied when officer shot at vehicle

13  moving away from him because there was a "lack of danger to the shooter or others").

### 2.    Fourteenth Amendment

15  Defendants also seek summary judgment on the Fourteenth Amendment claim against

16  Johnson.  Defendants argue that the Fourteenth Amendment claim fails because Johnson's use of

17  force was a "snap judgment" made during an escalating situation and there is no evidence to

18  support a Fourteenth Amendment claim.  Doc. 53 at 16-17.

19  Under the Fourteenth Amendment, an officer's "conduct that 'shocks the conscience' in

20  depriving [family members] of [a liberty interest in the companionship and society of a family

21  member] is cognizable as a violation of due process."  *Wilkinson*, 610 F.3d at 554.  An officer's

22  conduct shocks the conscience if (1) the officer acted with a purpose to harm for reasons

23  unrelated to legitimate law enforcement objectives; or (2) the officer acted with deliberate

24  indifference.  *Id.*  Defendants argue that the purpose to harm standard applies.[6]

---

[6] Plaintiff does not address defendants' argument as to the appropriate standard in her opposition
to the motion for summary judgment and therefore, for purposes of the present motion, concedes
that the purpose to harm standard applies.  The purpose to harm standard applies where officers
made a snap judgment based on an escalating situation, such as when an encounter lasts for a few
minutes, and can apply even when the officer "may have helped to create an emergency situation
by his own excessive actions."  *Peck v. Montoya*, 51 F.4th 877, 893-94 (9th Cir. 2022) (internal

1  "The purpose to harm standard is a subjective standard of culpability." *A.D. v. California*

2  *Highway Patrol*, 712 F.3d 446, 453 (9th Cir. 2013).  "[I]t is the intent to inflict force beyond that

3  which is required by a legitimate law enforcement objective that 'shocks the conscience' and

4  gives rise to liability under § 1983[.]" *Porter v. Osborn*, 546 F.3d 1131, 1140 (9th Cir. 2008)

5  (internal quotation marks and citation omitted).  Although evidence of ulterior motive or bad

6  intent is not required to satisfy the purpose to harm standard, "most meritorious purpose to harm

7  claims will involve evidence of ulterior motive or bad intent separate and apart from evidence of

8  an unreasonable use of force." *Nehad*, 929 F.3d at 1139-40.

9        Plaintiff does not address defendants' argument that summary judgment is proper as to the

10  Fourteenth Amendment claim.  "[I]t may be possible for an officer's conduct to be objectively

11  unreasonable [under the Fourth Amendment] yet still not infringe the more demanding standard

12  that governs substantive due process claims [under the Fourteenth Amendment]." *Ochoa v. City*

13  *of Mesa*, 26 F.4th 1050, 1057 (9th Cir. 2022) (internal quotation marks and citation omitted

14  omitted).  Even if Johnson's use of deadly force was unreasonable, plaintiff has not presented any

15  evidence that Johnson's use of force was unconnected to a legitimate law enforcement objective.

16  *See Peck*, 51 F.4th at 890 (granting summary judgment as to Fourteenth Amendment claim

17  because there was no evidence to suggest that deputies shot decedent "for any other purpose than

18  their (possibly mistaken) perception for the need for self-defense.")

19        Accordingly, defendants' motion for summary judgment as to the Fourteenth Amendment

20  claim is granted.

21        **B.    State Law Claims**

22        Defendants also move for summary judgment on plaintiff's state law battery, negligence

23  causing wrongful death, and Bane Act claims.

24        **1.    Battery Claim**

25        Defendants move for summary judgment on the state law battery claims against Johnson

26  and Madera County on the basis that the force Johnson used was not excessive under the Fourth

27  ————————————————

28  quotation marks and citation omitted).

1    Amendment.  Doc. 53 at 15.  Defendants are correct that the battery state law claim is analyzed

2    under the same standard as a claim for excessive force under the Fourth Amendment.  *See Edson*

3    *v. City of Anaheim*, 63 Cal. App. 4th 1269, 1273 (1998) ("A peace officer who uses unreasonable

4    or excessive force in making a lawful arrest or detention commits a battery upon the person being

5    arrested or detained as to such excessive force.") (internal quotation marks and citation omitted);

6    see also *Garlick v. Cty. of Kern*, 167 F. Supp. 3d 1117, 1177 (E.D. Cal. 2016).

7        The battery claim against Johnson is premised on the same facts as the claim for excessive

8    force, FAC ¶¶ 19-21, and the claim against the County is based on vicarious liability, *id.* ¶ 23.  As

9    there is a triable issue as to whether Johnson's use of force was reasonable under the Fourth

10   Amendment, defendants' motion for summary judgment as to the battery claim is denied.  *See*

11   *Brown v. Ransweiler*, 171 Cal. App. 4th 516, 527 (2009) ("A state law battery claim is a

12   counterpart to a federal claim of excessive use of force. In both a plaintiff must prove that the

13   peace officer's use of force was unreasonable.").

14                              **2.    Bane Act Claim**

15       Defendants also move for summary judgment on plaintiff's Bane Act claim against

16   Johnson.  The Bane Act provides a cause of action for an intentional violation of a person's state

17   or federal constitutional or legal rights by "threats, intimidation or coercion."  Cal. Civ. Code

18   § 52.1(b); *see Allen v. City of Sacramento*, 234 Cal. App. 4th 41, 67 (2015).  "[T]he Bane Act

19   does not require the 'threat, intimidation or coercion' element of the claim to be transactionally

20   independent from the constitutional violation alleged."  *Reese v. Cnty. of Sacramento*, 888 F.3d

21   1030, 1043 (9th Cir. 2018) (internal quotation marks and citation omitted).  However, the Bane

22   Act requires that the defendant have a specific intent to violate plaintiff's rights.  *Id.*  "[R]eckless

23   disregard for a person's constitutional rights is evidence of a specific intent to deprive that person

24   of those rights."  *Id.* at 1045 (internal quotation marks and citation omitted).

25       The Bane Act claim against Johnson is based on the same facts as the claim for excessive

26   force under the Fourth Amendment.  There is a triable issue of fact as to whether Johnson acted

27   with reckless disregard.  Accordingly, defendants' motion for summary judgment as to the Bane

28   Act claim is denied.

### 3. Negligence and Wrongful Death Claim

Plaintiff asserts a cause of action against Johnson, Iniguez, and Majeski for negligence resulting in wrongful death. Doc. 32 at 4. To succeed on a negligence claim, "a plaintiff must show that [the] defendant had a duty to use due care, that he breached that duty, and that the breach was the proximate or legal cause of the resulting injury." *Hayes v. Cty. of San Diego*, 57 Cal. 4th 622, 629, 160 (2013) (internal quotation marks omitted) (alterations in original) (quoting *Nally v. Grace Comm'y Church*, 47 Cal. 3d 278, 292, 253 (1988)); *see also A.G.1 by & through Uribe v. City of Fresno*, No. 1:16-cv-01914-NONE-SAB, 2021 WL 4502949, at *2 (E.D. Cal. Oct. 1, 2021).

#### a. Negligence claim against Johnson

In California, a claim for negligent use of deadly force is broader than an excessive force claim under the Fourth Amendment. *Murillo v. City of Los Angeles*, 707 F. Supp. 3d 947, 966 (C.D. Cal. 2023). Negligence is broader in that "[l]aw enforcement personnel's tactical conduct and decisions preceding the use of deadly force are relevant considerations under California law in determining whether the use of deadly force gives rise to negligence liability." *Garlick*, 167 F. Supp. 3d at 1178 (internal quotation marks and citations omitted). Because there is a triable issue as to whether Johnson's decision to use deadly force was reasonable under the totality of the circumstances, defendants' motion for summary judgment as to plaintiff's negligence claim against Johnson is denied.

#### b. Negligence claim against Iniguez and Majeski

Plaintiff's negligence claim is based on (1) the alleged improper use of the Taser, the alleged ineffective use of a K-9, and the failure to disable Alfaro's vehicle before Alfaro was shot, and (2) Johnson's use of deadly force against Alfaro. FAC ¶ 26. Because any excessive force claim against Iniguez and Majeski was dismissed without leve to amend, Doc. 32 at 3, the relevant inquiry is whether Iniguez and Majeski's conduct negligently created a situation that proximately caused the later use of deadly force by Johnson. *See Koussaya v. City of Stockton*, 54 Cal. App. 5th 909, 941-42 (2020). While Majeski and Iniguez's conduct is part of the totality of the circumstances relevant to Johnson's shooting of Alfaro, plaintiff has not identified any

1    basis for holding Majeski and Iniguez liable for the negligent wrongful death of Alfaro.

2         Viewing the facts in the light most favorable to plaintiff, no reasonable jury could find

3    Majeski or Iniguez were negligent.  Neither Majeski nor Iniguez fired any bullets at Alfaro.

4    Majeski attempted to prevent Alfaro from initiating a new car chase by using his police dog, by

5    attempting to stop Alfaro from starting the truck, and by using a stun taser to attempt to subdue

6    Alfaro.  After these efforts failed and Alfaro was able to break free of him and start the truck,

7    Majeski moved to stand behind Johnson.  Iniguez, likewise, attempted unsuccessfully to stop

8    Alfaro from starting the truck.  When Alfaro nonetheless managed to start the vehicle, Iniguez got

9    to safety and moved to stand beside Johnson.  Iniguez and Majeski were not required to stop their

10   actions in the equipment yard simply because Alfaro resisted arrest.  *See Koussaya*, 54 Cal. App.

11   5th at 942  (officer "not required to retreat or desist from his efforts to apprehend [felons] on

12   account of their violent resistance.").[7]

13        Plaintiff argues that the officers' actions were not effective but provides no argument or

14   evidence that raises a triable issue of fact that Iniguez and Majeski's conduct was negligent.  "As

15   long as an officer's conduct falls within the range of conduct that is reasonable under the

16   circumstances, there is no requirement that he or she choose the 'most reasonable' action or the

17   conduct that is the least likely to cause harm and at the same time the most likely to result in the

18   successful apprehension of a violent suspect, in order to avoid liability for negligence."  *Brown*,

19   171 Cal. App. 4th at 537.  Plaintiff offers no argument or any evidence that Iniguez and Majeski's

20   conduct or use of force in the equipment yard was negligent, much less that it created a dangerous

21   situation that led to the use of deadly force.

22        Plaintiff also argues that Iniguez and Majeski are liable for negligence because they failed

23   to prevent Alfaro's initial escape and continued a dangerous car chase, which led to Johnson's use

24   _____

25   [7] Additionally, the undisputed facts show that there were three arrest warrants for Alfaro and that
     the officers had the legal authority to arrest Alfaro.  SUF No. 2-3.  The undisputed facts also show

26   that the officers formulated a plan to apprehend Alfaro, SUF Nos. 4-7, but Alfaro was tipped off
     to the officers' presence and fled to his vehicle, SUF Nos. 11-12.  A vehicle pursuit then

27   followed, with various patrol cars chasing Alfaro through rural roads.  It is also undisputed that
     Sergeant Thomas assessed the situation and the risk factors associated with the high-speed pursuit

28   and determined that it was reasonable to continue the pursuit.  SUF No. 25-26.

1  of deadly force.  Doc. 63 at 18.  In California, pre-shooting tactics may be the basis for

2  negligence liability "if the tactical conduct and decisions leading up to the use of deadly force

3  show, as part of the totality of circumstances, that the use of deadly force was unreasonable."

4  *A.G.1*, 2021 WL 4502949, at *2 (internal quotation marks and citation omitted).  "*Hayes* eschews

5  the idea that an officer's obligation to act reasonably in using deadly force functions

6  independently of an injury the officer inflicts."  *Golick v. State of California*, 82 Cal. App. 5th

7  1127, 1142 (2022).

8     "Courts in this circuit have denied motions for summary judgment on negligence claims

9  where a police officer creates a dangerous situation that results in another officer using lethal

10  force."  *Est. of Smith v. Holslag*, No. 16-CV-2989-WQH-MSB, 2020 WL 7863428, at *12–14

11  (S.D. Cal. Dec. 31, 2020) (denying summary judgment for shooting officer but granting summary

12  judgment for non-shooting officer who provided safety information, helped set up perimeter, did

13  not directly communicate with shooting officer, and did not use force during the incident); *see

14  also Dorger v. City of Napa*, No. 12-CV-00440-WHO, 2013 WL 5804544, at *10 (N.D. Cal. Oct.

15  24, 2013) (denying summary judgment on negligence claim because "whether [the non-shooting

16  officer]'s preshooting conduct (*e.g.*, her plan to detain [the victim], including the presence of

17  armed officers) played a role in negligently provoking a dangerous situation that resulted in the

18  use of reasonable or unreasonable use of lethal force, is relevant under the totality of the

19  circumstances test.").

20     Plaintiff's argument is that, because Alfaro fled and the officers pursued him, the officers

21  created a dangerous situation that precludes summary judgment on the negligence claim.

22  However, plaintiff fails to address defendants' argument that there is a lack of proximate cause

23  linking the vehicle pursuit to the fatal use of force.  "The proximate cause question asks whether

24  the unlawful conduct is closely enough tied to the injury that it makes sense to hold the defendant

25  legally responsible for the injury."  *Est. of Smith*, 2020 WL 7863428, at *12–14 (quoting *Mendez

26  v. Cty. of Los Angeles*, 897 F.3d 1067, 1076 (9th Cir. 2018)).  "Whether an act is the proximate

27  cause of injury is generally a question of fact; it is a question of law where the facts are

28  uncontroverted and only one deduction or inference may reasonably be drawn from those facts."

1   *Id.* (internal quotation marks and citations omitted).

2          No reasonable jury could find that defendants Majeski and Iniguez created a dangerous

3   situation that proximately caused Alfaro's death.  Johnson's use of deadly force was not

4   proximately caused by the vehicle pursuit.  Neither the officers, Alfaro, nor any bystander

5   suffered an injury from the vehicle pursuit.  *See Koussaya*, 54 Cal. App. 5th at 942 (plaintiff's

6   injuries were not caused by officer's operation of patrol car, but rather plaintiff's decision to exit

7   the vehicle she was in).  More importantly, the vehicle pursuit ended when Alfaro exited the truck

8   after arriving at the equipment yard.  The fact that Alfaro subsequently reentered his truck and

9   tried to flee in it, and the subsequent shooting by Johnson, does not establish any negligence by

10  Majeski or Iniguez.

11         Plaintiff does not provide any argument or identify any facts that would support a jury

12  finding Iniguez and Majeski liable for negligence.  *See Simplis v. Culver City Police Dep't*, No.

13  2:10-cv-09497-JHN-MAN, 2012 WL 12892166, at *7 (C.D. Cal. Apr. 30, 2012) (granting

14  summary judgment where plaintiff did not point to a triable issue of material fact as to each

15  individual defendant that linked their actions to the use of force).  As no reasonable juror could

16  find that Majeski or Iniguez created a dangerous situation that resulted in Johnson's use of deadly

17  force, summary judgment on this claim is appropriate as to Iniguez and Majeski.

18  ///

19  ///

20  ///

21  ///

22  ///

23  ///

24  ///

25  ///

26  ///

27  ///

28  ///

1    **V.    CONCLUSION**

2          For the reasons explained above, defendants' motion for summary judgment, Doc. 52, is

3    GRANTED IN PART and DENIED IN PART, as follows:

4          a.   DENIED as to the Fourth Amendment claim against Johnson;

5          b.   GRANTED as to the Fourteenth Amendment claim against Johnson;

6          c.   DENIED as to the state law claims of battery, negligence, and violation of the Bane

7               Act against Johnson;

8          d.   DENIED as to the County's vicarious liability for Johnson's conduct on the state law

9               claims; and

10         e.   GRANTED as to the negligence claim against Iniguez and Majeski.

11

12

13   IT IS SO ORDERED.

14      Dated:   July 28, 2025                          _____

15                                                      UNITED STATES DISTRICT JUDGE

16

17

18

19

20

21

22

23

24

25

26

27

28